UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| AUSTIN REEVES, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| C. A. FRANEY; | § | |
| M. HERNANDEZ; | § | Civil Action No. 3:18-CV-03232-X |
| E. CASTELLANOS; | § | |
| D. CARSON; | § | |
| NEAL CAMPBELL; and | § | |
| CITY OF GARLAND, | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

**MEMORANDUM ORDER AND OPINION**

Plaintiff Austin Reeves alleged that several officers used excessive force against him during an incident at the Garland Detention Center. He also alleged they made patently false representations that ultimately led to him being indicted and prosecuted on false charges. Reeves sued the officers and the City of Garland under 42 U.S.C. § 1983. Defendant Officer Campbell is one of those officers. Previously, the Court granted Motions for Summary Judgment filed by the other officers involved in the case, as well as a Motion to Dismiss for Failure to State a Claim filed by the City of Garland. At that time, the Court refrained from ruling on Officer Campbell's Motion to Dismiss [Doc. No. 91] but allowed him to file a Motion for Summary Judgment, which he subsequently did [Doc. No. 99]. Today the Court

**GRANTS** Officer Campbell's Motion for Summary Judgment, finding that his conduct did not violate Reeves's constitutional rights, and **DISMISSES AS MOOT** Campbell's motion to dismiss [Doc. No. 91].

## I. Facts

Most of the facts of the case are not in dispute. The Garland Police Department dispatched Patrol Officer Franey to a domestic disturbance call. At the scene, bystanders informed Officer Franey that a man hit his girlfriend and fled, but the girlfriend refused to give a statement. While Officer Franey remained on the scene, Austin Reeves returned to the dispatch location. Reeves matched the description of the suspect and had visible scratches and marks on his chest, neck, and back—which appeared to be from a recent altercation. Reeves told Officer Franey that his girlfriend lived at the dispatch location and that he returned to get his phone. Officer Franey then initiated a background check, revealing that Reeves had an outstanding City of Dallas arrest warrant for public intoxication. Officer Franey then arrested Reeves and transported him to the Garland Detention Center. At the detention center, Reeves called his girlfriend using the center's telephone. Reeves started loudly arguing with her and became so upset that he slammed the phone into its base, breaking the phone.

This is where the parties' stories start differing. After Reeves broke the phone, the defendant officers claim they instructed him to return to his cell. But Reeves ignored the officers' instructions, walked away from his cell, and slammed both arms and his head against the glass cell pod door. In an attempt to maintain control,

Officers Carson and Castellanos (followed by Officer Campbell) approached and confronted Reeves. The officers then claim that Reeves lunged at Officer Castellanos, striking her in the chest and knocking her to the ground. Officer Castellanos tore her MCL in the fall. Reeves next turned and "squared up" to fight the other officers.[1]

The officers, including Officer Campbell, engaged Reeves and brought him to the floor, where Reeves remained on his hands and knees in what the officers viewed as an attempt to get back on his feet. The officers claim that Reeves remained in this position despite their attempts to wrestle control of his arms and legs and their repeated commands to stop resisting and get on the ground. Two officers then delivered what they identified as "trained strikes" to Reeves's legs and neck/shoulder region to stun him and regain control.[2] Reeves reportedly kicked Officer Carson in the face during this struggle, causing minor bleeding. Eventually the officers secured and cuffed Reeves's limbs, at which point the trained strikes ceased.

Reeves, however, tells a different story. Although admitting to hitting the pod door with one hand (but not his head or the other hand), Reeves claims he otherwise obeyed the officers' directions and was returning to his cell until the officers tackled him. Reeves denies striking Officer Castellanos, claiming she merely fell during the fray. He also denies attempting to fight the officers or kicking Officer Carson. Reeves also denies attempting to "stand back up" after being tackled and maintains that he only remained on his hands and knees to protect his face from smashing against the

---

[1] Doc. 70 at 8.

[2] *Id.* at 9.

floor.[3]  Finally, Reeves denies ever being told to "stop resisting" or "get on the ground" and instead claims the officers "thoroughly beat" him until he collapsed to the floor.[4]

Officer Franey, who was not present during the detention-center altercation, later prepared an affidavit of probable cause that included these events.  To prepare the affidavit, Officer Franey reviewed security video footage of the incident and interviewed Officers Hernandez, Castellanos, and Carson, who described the events as they have in this case.  Officer Franey presented the affidavit to a magistrate judge to determine probable cause, and Reeves was later charged with two counts of assault on a public servant for striking Officer Castellanos and kicking Officer Carson.  These two charges were later dropped.  Detention center staff took Reeves to Baylor, Scott & White Medical Center the following day where he was diagnosed with leg and wrist contusions and prescribed Motrin.

Officer Campbell was present during the altercation but was not involved in the preparation of affidavit prepared by Officer Franey.  Officer Campbell was not named in the original complaint, but Reeves added him to the lawsuit in his Fourth Amended Complaint [Doc. 82].  Subsequently, Officer Campbell moved to dismiss the suit as time barred.  In resolving the claims against the other officers and the City, the Court did not rule on Officer Campbell's motion to dismiss, but in the interest of judicial efficiency allowed Officer Campbell to file a Motion for Summary Judgment in light of the order granting the Motion for Summary Judgment as to all claims

---

[3] Doc. 75 at 15.

[4] *Id.*

against the officers named in the original lawsuit.

## II. Legal Standards

Summary judgment is appropriate only if, viewing the evidence in the light most favorable to the non-moving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[5]  "A material fact is one which 'might affect the outcome of the suit'" and "[a] factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[6]  Courts "resolve factual controversies in favor of the nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[7]  Thus, "the nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence."[8]

But qualified immunity affects that analysis.  The purpose of qualified immunity is to protect government officials from suit and liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[9]  Consequently, qualified immunity "alters the usual summary judgment burden of

---

[5] FED. R. CIV. P. 56(a).

[6] *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019) (alteration in original) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[7] *Antoine v. First Student, Inc.,* 713 F.3d 824, 830 (5th Cir. 2013).

[8] *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007) (quotation marks omitted).

[9] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

proof."[10]   Courts still draw all factual controversies in favor of the nonmovant, but once a government official asserts the defense of qualified immunity, the burden shifts to the plaintiff to show that the defense is not available.[11]   A plaintiff seeking to defeat qualified immunity must show genuine disputes of material fact about whether: (1) the official violated a statutory or constitutional right, and (2) whether the right was clearly established at the time of the challenged conduct.[12]   The Fourteenth Amendment's Due Process Clause protects pretrial detainees from the use of excessive force at the state level.[13] Thus, the Court must determine whether, viewing the summary judgment evidence in the light most favorable to Reeves, Officer Campbell violated Reeves's Fourteenth Amendment constitutional right to be free from excessive force, and whether the defendants' actions were objectively unreasonable in light of clearly established law at the time of the conduct in question.[14]   This is a high hurdle to overcome because qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."[15]

---

[10] *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

[11] *Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010).

[12] *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016)

[13] The Fourteenth Amendment protects the rights of pretrial detainees.   *Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015).  The Fourth, Fifth, and Eighth Amendments protect the rights of post-conviction detainees.  *DeShaney v. Winnebago Cty. Dep't of Social Servs.*, 489 U.S. 189, 200 (1989) (Fourth Amendment); *Hudson v. McMillian*, 503 U.S. 1, 2 (1992) (Eighth Amendment).  Because Reeves was a pretrial detainee, the Fourth, Fifth, and Eighth Amendment protections are not relevant to the Court's analysis.

[14] *Kingsley*, 576 U.S. at 391–92.

[15] *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

### III.  Application

### A.  The Detention Center Security Footage

The Fifth Circuit recently reaffirmed that courts "need not accept a plaintiff's version of the facts 'for purposes of [qualified immunity] when it is "blatantly contradicted" and "utterly discredited" by video recordings.'"[16]

Here, Reeves claims that he did not attack any of the detention officers, that he followed all orders, and that aside from breaking the facility telephone and spontaneously smashing his fists against the A-Pod door, he generally conducted himself in a manner that posed no security risk or physical threat to jail staff.  The video footage, however, shows otherwise.  After smashing his arms and face against the glass pod wall, the video shows that Reeves continued walking past the open A-Pod door the officers directed him to enter.  Next, Officers Castellanos, Carson, and Campbell moved to confront Reeves.  A struggle then ensued and the video captured Reeves's outstretched arm connecting with Officer Castellanos's chest as she was knocked off her feet.  The next few frames showed Reeves turn to face the rest of the officers and move backwards for several feet over several seconds before the entire group fell into a pile on the floor.  The footage then showed Reeves kneel with his hands and knees tucked underneath him while the officers, including Officer Campbell, attempted to wrestle his limbs and force him flat onto the floor.  Meanwhile the officers gave multiple commands to "stop resisting" and "get on the ground."

---

[16] *Garza v. Briones*, 943 F.3d 740, 744 (5th Cir. 2019) (quotation marks omitted).

Reeves did not heed these commands.  The officers also delivered knees, kicks, and strikes to Reeves's body.  All strikes ceased as soon as Reeves was flat onto the floor with the officers securing his arms and legs.

Far from the unprovoked use of force alleged by Reeves, the footage is consistent with the officers' account that Reeves refused the order to return to his cell, punched Officer Castellanos, and then turned to fight the other officers before being brought to the ground.  The video footage blatantly contradicts Reeves's account, and accordingly the Court need not credit Reeves's account as true.[17]

## B. Excessive Force

The issue is then whether Officer Campbell's use of force under these circumstances amounted to a violation of Reeves's Fourteenth Amendment right to be free from excessive force while awaiting trial.[18] An actionable claim that detention officers used excessive force in violation of Reeves's Fourteenth Amendment rights must demonstrate that Officer Campbell purposefully or knowingly used force that was objectively unreasonable.[19]  A court, however, "cannot apply this standard mechanically."[20]  Objective reasonableness "turns on the facts and circumstances of each particular case," and must be determined "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with 20/20

---

[17] *Garza*, 943 F.3d at 744.

[18] *Kingsley*, 576 U.S. at 396–97.

[19] *Id.*

[20] *Id.* at 397.

hindsight."[21]   Because these types of cases typically involve jail facilities and detention centers, courts "must also account for the legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in th[e] judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security."[22]   Finally, the Supreme Court's non-exhaustive list of factors for assessing reasonableness includes: (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or to limit the amount of force; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting.[23]

Here, applying the *Kingsley* factors establishes that Officer Campbell's use of force was not "objectively unreasonable."   First, there is a reasonable relationship between the need for force and the force used.   Reeves was unsecured, refusing commands to return to his cell, attacking multiple officers, and resisting restraint. In response, Officer Campbell and the other officers tackled him, wrestled his limbs, and limited themselves to trained, unarmed strikes that ceased once they secured Reeves.

Second, Reeves's injuries were minimal.   Reeves was taken to Baylor, Scott & White Medical Center the following day where the only diagnosed injuries

---

[21] *Id.* (quotation marks omitted).

[22] *Id.* (quotation marks omitted) (alterations in original).

[23] *Id.* (citing *Graham*, 490 U.S. at 396).

attributable to the officers' use of force were leg contusions, for which the medical staff prescribed Motrin.[24] Third, the officers tempered their use of force by employing only trained, unarmed strikes (which apparently caused little to no physical damage) and ceasing all strikes as soon as they secured Reeves.

Fourth, the severity of the security problem was significant. Reeves argues that he was unarmed, outside the immediate presence of other detainees, and highly unlikely to be capable of escaping the detention center altogether. That is true, but Reeves was still roaming unsecured while actively damaging property and injuring officers. Security in a jail setting can be fragile and even small chaotic events can snowball into larger disasters if unaddressed. Here, the officers perceived a significant security problem.[25] Because *Kingsley* counsels the Court to "account for the legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained" and "appropriately defer[] to policies and practices that in th[e] judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security," the Court will defer to their risk assessment.[26] This also applies to the fifth factor, the threat reasonably perceived by officers.

Finally, Reeves was actively resisting the officers. Reeves insists that he did not resist the officers' attempts to secure him but merely chose to remain kneeling on

---

[24] Doc. No. 71 at 70.

[25] *See* Declaration of Detention Officer Hernandez, Doc. No. 71 at 31 ("Because of the security and injury risks associated with [Reeves's] actions, we needed to secure him on the ground.").

[26] *Kingsley*, 576 U.S. at 397 (quotation marks omitted) (alterations in original).

his hands and knees, rather than lay on the floor as directed, in order to protect his face from hitting the floor.  As a detainee, however, Reeves has no authority to make that kind of executive decision.  Even taking Reeves's explanation as true, refusing the officers' demands to lay on the floor with his arms and legs out, in this situation, was active resistance.

Given the application of the *Kingsley* factors here, the Court concludes that the use of force employed by Officer Campbell in this situation was not objectively unreasonable.  Accordingly, Officer Campbell did not violate Reeves's Fourteenth Amendment right to be free from excessive force.[27]  Thus, Reeves's excessive force claim fails as a matter of law.

### C. Bystander Claim

Reeves also alleges a "bystander" section 1983 claim against Officer Campbell. The Fifth Circuit recognizes bystander liability under section 1983 where an officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act."[28] The implicit requirement here, however, is that the fellow officers must be violating an individual's constitutional rights.  Because the Court determined that no officers violated Reeves's Fourteenth Amendment right to be free from excessive force, there is accordingly no bystander liability against Officer Campbell.

---

[27] *Id.* at 396–97.

[28] *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013).

### D. Malicious Prosecution, Sixth Amendment, Continued Seizure

Reeves further claims a series of constitutional violations stemming from his allegation that Officer Campbell made patently false statements regarding the detention-center incident.[29]  The false representations allegedly occurred via Officer Franey's affidavit to the magistrate judge and the other officers' statements to Officer Franey, made for the purpose of creating that affidavit.  Specifically, Reeves argues that the video footage clearly established that he did not assault the detention officers, and therefore the officers falsified information by reporting an assault. According to Reeves, as a result of this falsification he was charged and prosecuted without probable cause, denied a fair trial (although the charges were voluntarily dismissed before a trial), and his liberty was impermissibly restricted in violation of his Fourth, Sixth, and Fourteenth Amendment rights.

The parties have spilt much ink weighing whether these rights exist under these circumstances in our Constitution.  That analysis, however, is irrelevant because each constitutional claim rests on the premise that the information given was false.  Here, the video makes clear that Reeves did assault the officers.  Officer Franey's affidavit and the other officers' statements reflect the events captured on video.  Therefore, there is no genuine dispute of material fact as to whether the officers falsified information—they simply did not. Reeves's assorted constitutional

---

[29] While the Fourth Amended Complaint does not directly allege that Officer Campbell had anything to do with the preparation of Officer Franey's affidavit, the causes of action are stated against the "Individual Defendants," which presumably includes Officer Campbell.

claims fail as a matter of law because the officers cannot have violated his rights by falsifying information if the information they gave was not false.

## IV.  Conclusion

For the foregoing reasons, the Court **GRANTS** the Motion for Summary Judgment [Doc. No. 99] as to all claims against Officer Campbell, based on the finding that his conduct did not violate Reeves's constitutional rights.  Because the Court grants summary judgment here, the Court **DISMISSES AS MOOT** Campbell's Motion to Dismiss [Doc. No. 91].

**IT IS SO ORDERED** this 5th day of February, 2021.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE